**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

HARRY J. JENSEN,              )
                              )
            Plaintiff,        )    Case. No. 11 C 4423
        v.                    )
                              )    Magistrate Judge Arlander Keys
MICHAEL J. ASTRUE,            )
Commissioner of Social        )
Security                      )
            Defendant.        )


<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff, Harry Jensen, moves this Court for Summary Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse a partially unfavorable final decision of the Commissioner of Social Security (the "Commissioner"). The Commissioner awarded a closed period of disability benefits but denied benefits after May 1, 2008. Mr. Jensen seeks an order reversing that decision or, in the alternative, remanding the case for further proceedings. The Commissioner has filed a Cross-Motion for Summary Judgment, asking this Court to affirm his final decision.

**Procedural History**

Mr. Jensen protectively filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") in December 2007, claiming that he was disabled as of December 31, 2006 because of shoulder pain, resulting from an

injury that occurred on the job, because of colon and bowel
issues resulting from a hemicolectomy, and because of high blood
pressure.  His application was denied initially on August 11,
2008 and on reconsideration on December 5, 2008.  In January
2009, Mr. Jensen requested a hearing before an administrative law
judge, and his case was assigned to ALJ Marlene Abrams, who held
the requested hearing on March 22, 2010.

**A. Hearing of March 22, 2010**

At the hearing on March 22, 2010, Mr. Jensen appeared,
represented by counsel and accompanied by his girlfriend,
Caroline Schuck.  The ALJ heard testimony from Mr. Jensen and
from Ms. Schuck; she also heard from a medical expert, who
offered opinions about Mr. Jensen's medical impairments, and from
a vocational expert, who offered opinions about Mr. Jensen's
ability to work.

**1. Mr. Jensen's testimony**

At the time of the hearing, Mr. Jensen, whose date of birth
is January 22, 1958, was 52 years old. R. at 54. He testified
that he lives with his girlfriend in a one-story home, which he
owns. R. at 78-79.  He testified that he graduated from high
school and worked his whole life as a commercial truck driver.
R. at 54.  He testified that the trucks he drove all had manual
transmissions, which required him to use his right arm to shift

2

gears.  R. at 59. He testified that the job also involved lifting
trailer doors and gates, and sometimes helping to load and unload
freight; he also testified that he frequently had to lift and
adjust pallets when loads were not balanced or correctly stowed,
and had to frequently climb in and out of the cab of his truck.
R. at 57-60.  He testified that the pallets he lifted weighed 10
to 20 pounds each. R. at 58.

With regard to his disabilities and impairments, Mr. Jensen
testified that, on December 31, 2006,[1] he fell off his truck
while trying to adjust some freight that had been improperly
loaded; he testified that, as he fell, he held on with one hand,
twisting his shoulder and tearing muscles in his arm.  R. at 61-
62.  He testified that, after the accident, the company
immediately sent him to the clinic, and then put him on light
duty; he testified that he had surgery in January 2007 and worked
light duty right up until the week of the surgery. R. at 63.  He
testified that, after the surgery, he was unable to go back to
work.  R. at 66.  He testified that, in connection with the
accident, he filed a workman's compensation claim and was
receiving, at the time of the hearing, $477.12 per week; he

---

[1]There is some evidence suggesting that the accident
occurred in September of 2006, *see* R. at 65, but the Court
accepts this date, given that it is the date upon which Mr.
Jensen relies for his date of onset.

3

testified that they still had not settled the claim, but that he was hoping to do so for a lump sum payment.  R. at 66-67.

He testified that he continued to have pain after his first shoulder surgery and that he had a second surgery on his shoulder in October 2008 to try to determine the cause of his pain; he testified that, during this second surgery, the doctors found and removed a suture knot, which had been left in his body during the first surgery.  R. at 44.

Mr. Jensen testified that, shortly after his first shoulder surgery, he was diagnosed with colon cancer; he testified that he had another surgery in April 2007 to remove the cancerous parts of his colon.  R. at 67.  He testified that, since that surgery, his body is unable to absorb necessary vitamins, and, as a result, he has to return to the hospital once a month to receive a shot that maintains the vitamin levels in his system. R. at 72.  Mr. Jensen testified that, since his surgery, he has had significant fatigue, and that he complains about it each time he goes to the doctor, but they have yet to offer a solution. R. at 73, 75. He testified that he does follow-up blood tests periodically and CT scans every couple of months or whenever the doctor feels it is necessary.  R. at 72.  He also testified that, since his surgery, he has frequent, unpredictable bowel movements between four and six times a day.  R. at 78.  He testified that

4

his treating physician, Dr. Chu, told him that this was something he was going to have to live with for the rest of his life and that there was nothing he could do to alleviate the frequent bowel movements. R. at 78. He testified that his doctor had not prescribed anything to alleviate the frequent bowel movements; nor has she prescribed anything for his pain. R. at 79.

Mr. Jensen testified that the pain in his abdomen is constant and that the pain in his shoulder is intermittent, brought on by any kind of repetitive movement or use. R. at 84-85. He testified that, on a normal day, his pain level is a 10 out of 10; when pressed, he backed off that slightly, acknowledging that, although sometimes it was a 10, it was often at a 9. R. at 95-96. He testified that he was on painkillers for about two months after his first surgery, but that, since that time, he has taken only Ibuprofen; he testified that, despite his complaints of pain, his doctor declines to prescribe additional medication because she believes it would cause him to have additional bowel issues. R. at 88.

With regard to his daily activities, Mr. Jensen testified that he is unable to do much of anything throughout the day, except watch tv. R. at 81-82. He testified that his girlfriend moved in with him and that she does pretty much everything; he just mostly "takes it easy and lays down." R. at 93. He

testified that he leaves the house maybe once or twice a week to accompany his girlfriend to the grocery store, to pay his mortgage or to attend doctor appointments. R. at 84. He testified that he does not like to drive or even ride in a car because the bouncing causes him pain; nor does he walk. R. at 82-83. He testified that he also has trouble sleeping because of restless leg syndrome and because of his shoulder and abdominal pain. R. at 98-99. He testified that his pain also affects his ability to concentrate and that he can't "make reasonable thoughts," can't think something through without the pain interfering." R. at 100.

In terms of general observations that were apparent from the hearing transcript, the Court notes that Mr. Jensen left the hearing twice to use the restroom. The Court also notes that Mr. Jensen came into the hearing using a cane, which he stated he used because it helped with his pain, even though it had not been prescribed by a doctor or therapist. R. at 68.

### 2. Testimony of Caroline Schuck

After Mr. Jensen, the ALJ heard from Caroline Schuck, Mr. Jensen's girlfriend, who was waiting outside of the room when Mr. Jensen testified. Ms. Schuck testified that, although she had known Mr. Jensen for years, she became his girlfriend in about 2006 and had lived with him since 2007; she testified that she

moved in with him after his colon surgery to help take care of him. R. at 103. She testified that she had back surgery in November of 2007 and had been off work since that time, so they were together pretty much constantly. R. at 104.

Ms. Schuck testified that Mr. Jensen's shoulder hurts and that he cannot really move it; she testified that, as a result, she does everything around the house. R. at 105. She testified that he pretty much does nothing all day; she testified that he might take a walk, do some dishes or do something to get out of the house, but that most days he just sits or lies down. R. at 108-109.

Ms. Schuck testified that Mr. Jensen occasionally screams in pain if he rolls onto his arm or if he moves it too abruptly. R. at 105. And she testified that he has trouble sleeping and wakes her up at least once a night, sometimes more, either because of his pain or because he has to go to the bathroom. R. at 106. She testified that he goes to the bathroom 4 to 6 times a day and spends about 15 to 20 minutes in the bathroom sometimes. R. at 106. She testified that she assumes these issues stem from his surgery because he didn't go that often before it. R. at 106. Additionally, Ms. Schuck testified that she accompanies Mr. Jensen to his doctor appointments, and she confirmed that she has heard Dr. Chu explain to Mr. Jensen that his condition will cause

some discomfort and pain, and that he should take Ibuprofen; she confirmed that the doctor has not prescribed him any pain medication and that she had indicated that he will have to deal with pain the rest of his life. R. at 107.

### 3. Testimony of Dr. Walter Miller, Medical Expert

Next, the ALJ heard from Dr. Walter Miller, who testified as a medical expert ("ME"). Dr. Miller testified that he had reviewed Mr. Jensen's medical records and that, per those records, Mr. Jensen had a torn and "frayed" tendon. R. at 112. The ME further testified that, after the first surgery, because Mr. Jensen had complained of severe pain, his treating physician, Dr. Tarbit, thought that perhaps there were other issues within his arm, but that the second surgery revealed no real issues; he testified that the suture they found would not have caused severe pain. R. at 113-115, 135. The ME testified that he saw nothing in the medical records to explain why Mr. Jensen would have permanent pain in his shoulder. R. at 139.

The ME further testified that Mr. Jensen was diagnosed with colon cancer, which was staged at IIA, meaning it had moved a little outside the colon but had not spread to the lymph nodes or the liver. R. at 115. He testified that, according to the medical records, the surgery was successful and Mr. Jensen did not require chemotherapy or radiation; his post-surgery CT scans

8

appeared normal.  R. at 115.  The ME noted that Mr. Jensen did have some post-surgery tissue inflammation, but, according to the x-rays, that was resolved by May of 2008.  R. at 116.

The ME testified that the symptoms Mr. Jensen claimed to experience – discomfort in the bowels, as well as frequent bowel movements – are normal post-surgery symptoms; he testified, however, that he would have expected the symptoms to gradually dissipate after surgery. R. at 116.  The ME testified that it typically takes about a year for the colon to readjust to the fluid intake and that most patients recover from this kind of colon surgery within a year. R. at 122, 145.

The ME further testified that, if Mr. Jensen were experiencing pain to the degree claimed, he would expect to see records documenting tests done to explore the cause of this pain (bowel obstruction tests, e.g.); he saw no such records.  R. at 117.  Additionally, although Mr. Jensen testified that he receives CT scans every few months, the ME noted that records from such scans did not appear in the record.  In short, the ME testified, there was no objective explanation for Mr. Jensen's complaints of permanent pain.   R. at 118.

Dr. Miller also testified that there were no postoperative adhesions, and the records do not show that Oak Forest Hospital did any obstructive tests.  R. at 118. The record is also silent

as to why Mr. Jensen had his first surgery performed at La Grange Hospital under Dr. Friemark's care, but was later being treated by Dr. Tarbit. R. at 118-119. Dr. Miller testified that when a patient has post surgery complications, it is customary that the patient return to the doctor who performed the surgery in order to do more tests, particularly if the patient is experiencing pain. R. at 119. He also testified that switching doctors would not be explained by a lack of insurance because such post-operative care would be included under the same claim as the surgery.

The ME testified that, if he were trying to assign a closed period of disability for Mr. Jensen, he would go through April 30, 2008, one year after the colon surgery. R. at 121. He testified that the record does not contain evidence from which one could conclude that the disability continued after that date – there were no obstruction tests done and the only tests in the record showed that everything was normal, there were no loops or obstructions in the bowel, no thickness. R. at 123.

Dr. Miller testified that, from December 2006 to April 30, 2008, Mr. Jensen would have been unable to sustain employment because he would have needed too many bathroom breaks throughout the day. R. at 123. He testified that, thereafter, he would still limit Mr. Jensen to light work, with limited (occasional)

10

overhead work on the right side and limited lifting on the right side (limited to 10 lbs. frequently and 20 lbs. occasionally); he testified that, in his view, Mr. Jensen could sit for 6 hours in an 8-hour workday, but could never climb ladders, ropes or scaffolds. R. at 125-126.

When questioned by Mr. Jensen's attorney, the ME acknowledged that Mr. Jensen's should injury was very serious - rated as a grade 3 out of 4. R. at 128. He acknowledged that the tendon ruptured and that there was also significant fraying of the bicep tendon, and he acknowledged that physical therapy had been largely unsuccessful. R. at 127. The ME testified that status-post shoulder surgery could be an objective basis for pain, and that complaints of disabling pain 3 to 6 months post-surgery would be reasonable, but testified that he could find no basis in the objective medical records to justify what he perceived to be complaints of "permanent pain." R. at 139-140.

**4. Testimony of Thomas Dunleavy, Vocational Expert.**

Finally, the ALJ heard testimony from Mr. Thomas Dunleavy, who testified as a vocational expert ("VE"). The VE testified that Mr. Jensen's past work as a truck driver would be classified at the medium level of exertion as defined by The Dictionary of Occupational Titles ("DOT"), but would be classified at the light level as he performed it (he said he lifted 10 to 20 lbs.). R. at

150-151. He testified that the job would also be classified as an SVP 4, semiskilled. R. at 151.

The VE testified that, given the limitations on overhead reaching, his past work would be precluded; he testified that this would be the case whether or not one considered his vision issues. R. at 153. The VE testified, however, that, despite his limitations, he could perform other work that existed in significant numbers in the Chicago metropolitan area, e.g., cashier (SVP 2, unskilled, 15,000 jobs), self-service sales attendant (SVP 2, 3,000 jobs); and usher (SVP 2, 2,000 jobs) to name just a few. R. at 154-155. The VE testified that Mr. Jensen would be limited to unskilled work and that he had no transferable skills. R. at 154.

The VE testified that, if Mr. Jensen were limited generally in his reaching to occasional (as opposed to just overhead reaching), he could still do the jobs identified. R. at 159. He testified, however, that if he were limited to occasional with respect to handling in his dominant hand, he could likely still do the usher job, but he would be precluded from performing the other jobs. R. at 162-165. The VE also testified that employers generally tolerate a 15-minute break on each side of a shift, plus a 30-minute break mid-shift, plus up to two additional quick bathroom breaks (5-6 minutes each, one on each side of the mid-

12

shift break).  R. at 165-166.  He testified that, anything more, in terms of the number of breaks or the length of the breaks, would preclude employment.  R. at 166.

**B. Medical Evidence.**

In addition to the testimony provided by Mr. Jensen, the Medical Examiner and Vocational Expert, the ALJ also had before her medical records covering both Mr. Jensen's shoulder injury and his colon cancer.

Medical records show that Mr. Jensen had surgery at Mercy Hospital and Medical Center on January 1, 2007, and that, at that time, Mr. Jensen's activities were restricted. R. at 319. Mr. Jensen had an arthroscopy of the right shoulder to repair a superior labrum anterior posterior lesion (a SLAP repair) and to address bicep tendinitis. R. at 339.  Records show that, during surgery, the physician found an unstable SLAP lesion and significant fraying. R. at 339.  The physician noted that the most significant injury was grade 3, out of 4. R. at 340.  The records show that, although Mr. Jensen was recovering post-surgery, he continued to experience pain. R. at 617. Mr. Jensen had a second diagnostic arthrosporic surgery on October 14, 2008; at that time, the surgeons found and removed a suture knot. R. at 673.

The record shows that, after his second surgery, Mr. Jensen had physical therapy for his shoulder; the progress notes from November and December of 2008 show that he complained of pain constantly. *See, e.g.*, R. at 609, 626.

The record shows that Mr. Jensen was diagnosed with colon cancer in March of 2007 and that he underwent a right hemicolectomy on April 30, 2007. R at 378. Mr. Jensen was admitted to La Grange Memorial Hospital for surgery on April 30, 2007 and discharged on May 4, 2007, having tolerated the surgery well. R. at 576. Records show that Mr. Jensen did not need chemotherapy or radiation therapy in the wake of his surgery.

The record shows that Mr. Jensen had a follow-up visit with the doctor who performed his hemicolectomy on May 17, 2007; at that time, he complained of increasing abdominal pain, though he reported having no other significant issues. R. at 721. The doctor's report from that follow-up visit indicates that Mr. Jensen had been voiding well and moving his bowels without difficulty. R. at 271. A CT scan taken on May 18, 2007 revealed "a phlegmonous reaction in the area of the ileocolonic anestomosis." R. at. 721. There was no evidence of bowel obstruction or any other abnormalities. R. at 721. Nevertheless, Mr. Jensen was admitted to the hospital that day for "bowel rest, IV antibiotics and pain control." R. at 722.

14

The record shows that Mr. Jensen was discharged on May 24, 2007; he continued to improve throughout his stay and was sent home with Dilaudid for pain.

The record shows that Mr. Jensen returned to his surgeon on June 12, 2007 and, at that time, reported feeling better, but still tired; he reported that he still had some abdominal discomfort but was continuing to improve. R. at 524. Mr. Jensen reported having 1 to 2 stools per day, usually formed, and he reported intermittent nausea but no vomiting. R. at 524. On examination, the doctor noted that the previous abdominal fullness on the right side had diminished considerably. R. at 524.

At the next follow-up appointment on June 29, 2007, Mr. Jensen reported that he was improving, but that his stools were "still loose and urgent"; he reported having 2 to 3 such stools per day. R. at 570. A CT scan taken June 25, 2007 showed significant improvement since the May 18th scan and the doctor noted that the inflammatory changes seen in that earlier scan had "nearly resolved." R. at 694-695. There was no evidence of any obstruction. R. at 695.

On February 11, 2008, Mr. Jensen had an initial visit at Oak Forest Hospital; at that time, he complained of right shoulder pain and checked a box indicating that he was experiencing such

15

symptoms; he did not check the boxes for stomach problems, constipation or liquid stools. R. at 500.

Mr. Jensen sought follow-up care at the oncology clinic. On October 28, 2008, he denied any complaints. R. at 493. On November 4, 2008, he complained of pain and was told to avoid heavy lifting, to take Tylenol and to go to the ER to rule out an obstruction if the pain persisted; there is no evidence that he went to the ER. R. at 493. He returned to the clinic on January 8, 2009, complaining of abdominal pain. R. at 488. A CT scan of Mr. Jensen's abdomen and pelvis taken November 12, 2009 showed no abnormalities, no obstruction, no air and no fluid. R. at 678.

In addition to the shoulder and colon issues, the record shows that, on April 19, 2007, Mr. Jensen was diagnosed with anemia, exhibiting noticeable fatigue. R. at 694.

The record also contains a Function Report prepared at the behest of the SSA on July 25, 2008; the report was based upon a telephone interview with Mr. Jensen. R at 271-280. According to that report, Mr. Jensen stated that he could do household chores such as laundry, cleaning and cooking, R. at 271, 273; he could prepare his own meals, go outside daily, drive a car, go out alone, shop in stores and handle his own finances. R. at 273-274. He reported that he had no difficulty walking or paying attention, but indicated that he had slowed down since his injury

and tried to protect his right shoulder by lifting mostly with
his left side. R. at 276. He reported having sharp pains in his
shoulder and pressure in his abdomen. R. at 278. Based upon the
interview, the SSA representative concluded that Mr. Jensen was
capable of performing work at the medium level of exertion and
that he could perform his past relevant work as a truck driver.
R. at 280.

The record also includes a Physical Residual Functional
Capacity Assessment completed by Dr. George Andrews on July 30,
2008. After noting, among other things, that Mr. Jensen
continually complained of persistent shoulder pain, Dr. Andrews
determined that Mr. Jensen could lift 50 lbs. occasionally and 25
lbs. frequently; could stand or walk for 6 hours in an 8-hour
workday; could sit for 6 hours in an 8-hour workday; could push
and pull without limitations and had no postural, visual,
communicative or environmental limitations; he determined,
however, that Mr. Jensen was limited to occasional overhead
reaching with his right shoulder. R. at 465-468.

On November 12, 2008, Dr. Mahesh Shah performed a
consultative examination at the behest of the Bureau of
Disability Determination Services. Dr. Shah spent "about 37
minutes" reviewing Mr. Jensen's medical history and examining
him, and, afterward, concluded that Mr. Jensen had mild abdominal

17

pain and mildly limited range of motion in his right shoulder. R. at 732-735. Dr. Shah noted that Mr. Jensen reported limited mobility and an inability to carry anything heavy on his right side. R. at 732-733. He also noted that, on examination, Mr. Jensen reported mild tenderness and mild discomfort on the right side of his abdomen. R. at 734-735. Mr. Jensen reported that he still had pain in his right shoulder and that it was "getting worse progressively." R. at 732.

On December 2, 2008, Dr. Charles Wabner, a consultative non-examing physician, completed a Physical Residual Functional Capacity Assessment form for Mr. Jensen. R. at 478. Dr. Wabner noted that the objective medical evidence showed that Mr. Jensen had no motor loss, no sensory loss and reflex changes, notwithstanding two surgical repairs of Mr. Jensen's right shoulder. R. at 479-86. He noted that Mr. Jensen should never climb ladders, ropes or scaffolds but that he was otherwise not limited. R. at 482.

## C. The ALJ Decision

On April 16, 2010, the ALJ issued her decision, and concluded that Mr. Jensen was "disabled" within the meaning of the Social Security Act from December 31, 2006 through April 30, 2008. R. at 17. However, the ALJ determined that on May 1, 2008, Mr. Jensen began to make medical improvements, and that he had

been able to perform substantial, gainful activity from that date through the date of the decision. R at 17.

Using the 5-step inquiry outlined in the social security regulations, at step one, the ALJ determined that Mr. Jensen has not engaged in any substantial gainful activity since December 31, 2006, the alleged onset date. 20 C.F.R. § 404.1520(a) and 416.920(a). R. at 21.

At step two, the ALJ concluded that at all times relevant to her decision, Mr. Jensen had the following severe impairments: status-post right shoulder surgeries, and status post hemi colectomy. R. at 21

At step three, the ALJ determined that from December 31, 2006, through April 30, 2008, Mr. Jensen did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d). R at 21. In regards to Mr. Jensen's colon cancer, Mr. Jensen had a right hemicolectomy. R. at 378; R. at 576-578. Mr. Jensen's doctor reported that he had done well after surgery. R. at 25. In May of 2007, Mr. Jensen was admitted to the hospital for bowel rest, intravenous antibiotics, and pain control, but the record reflects that the issues were clearly resolved. R. at. 730-732. The medical evidence showed that Mr. Jensen had recovered well

19

and did not require any radiation or chemotherapy after surgery R. at 694-695. In May 2007, Mr. Jensen reported that he had not had any very loose stools. In June of 2007, Mr. Jensen noted that he had been improving, but his stools were still loose and urgent, and he was having two to three stools a day. R. at 570; R. at 585. However, in an examination on February 11, 2008, Mr. Jensen denied any bowel or bladder problems. R. at 24. There are no objective reports after this date regarding loose stools, but the ALJ extended the closed period of disability for several additional months until April 30, 2008. R. at 25

In terms of Mr. Jensen's shoulder injury, the ALJ discussed Mr. Jensen's January 27, 2007 arthroscopy, and noted that he had been cleared to do light work after the surgery. In April of 2007, an examination reported that Mr. Jensen had subjective complaints that were greater than the objective findings. In October of 2008, Mr. Jensen had a diagnostic arthrosporic surgery on his right shoulder with debridement of his biceps. R. at 26. A foreign body was removed from his right shoulder during the surgery, which Mr. Jensen tolerated well with no operative complications. R. at 26. The ALJ accommodated this shoulder injury with additional limitations. Mr. Jensen can never climb ladders, ropes or scaffolds; and Mr. Jensen's should only

occasionally reach above shoulder level with his right shoulder.
R. at 24.

As to Mr. Jensen's other medical issues, the ALJ determined
that Mr. Jensen's high blood pressure, anemia, and fatigue would
not prevent him from working in accordance with the RFC. R. at
24-25.

The ALJ concluded that the RFC assessment was supported by
objective medical evidence; she was convinced his bowel movements
had improved and would not prevent Mr. Jensen from working in
accordance with the residual functional capacity. Mr. Jensen
reported doing his household chores, and had reported that he
could take care of his personal needs. R. at 273. Mr. Jensen
testified that he had no issues with walking or paying attention.
He had done laundry, driven, shopped in stores, went out alone,
and cooked. R. at 270-77. Mr. Jensen was not credible in his
hearing testimony when he claimed that he performed many fewer
activities. R. at 27. Accordingly, the ALJ determined that Mr.
Jensen was capable of working in accordance with the below
residual functional capacity. R. at 27.

Before fully considering step four, the ALJ determined that
Mr. Jensen had a residual functional capacity (RFC), to perform
light work as defined in 20 CFR 404.1567(B) and 416.967(b),
except that Mr. Jensen would also need to be able to use the

restroom without notice and without limitation. R. at 21. The ALJ found that Mr. Jensen's statements about his bowels were generally credible. R. at 21. The ALJ determined that, although Mr. Jensen's functional capacity for basic work activities had increased, he was still unable, even after May 1, 2008, to perform his past relevant work. R. at 28.

At step four, the ALJ concluded that, from the period of December 31, 2006 through April 30, 2008, Mr. Jensen would have been unable to perform his past relevant work as defined by 20 CFR 404.1565 and 416.965. Mr. Jensen would have also been unable to perform any work during this time because of his bowel issues. R. at 21. The independent ME, Dr. Miller, testified that his bowel issues would have prevented Mr. Jensen from sustaining substantial gainful activity (SGA) from December 31, 2006 through April 30, 2008. R at 21. The ALJ concluded that beginning on May 1, 2008, Mr. Jensen has had the residual functional capacity to perform light work as defined in 20 CFR 404.1529 and 416.929 and SSR 93-4p and 96-7p. In considering Mr. Jensen's symptoms, the ALJ followed a two-step process. Because Mr. Jensen's symptoms can sometimes suggest a greater level of impairment than what can be shown by objective medical evidence, there are other factors that were considered when the ALJ assessed the credibility of Mr. Jensen's statements. These factors include:

22

1. Mr. Jensen's daily activities;

2. The location, duration frequency, and intensity of Mr. Jensen's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication Mr. Jensen takes, or has taken, to alleviate pain or other symptoms;

5. Treatment, other than medication, Mr. Jensen receives, or has received, for relief of pain or other symptoms;

6. Any measures, other than treatment, Mr. Jensen uses or has used to relieve pain or other symptoms; and

7. Any other factors concerning Mr. Jensen's functional limitations and prescriptions due to pain or other symptoms. SSR 96-7p.

The ALJ determined that Mr. Jensen's medically determinable impairments could reasonably expect to produce the alleged symptoms; however, Mr. Jensen's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible beginning on May 1, 2008, to the extent they are inconsistent with the residual functional capacity assessment. R. at 23.

At step five, the ALJ determined that Mr. Jensen was unable to make a successful vocational adjustment to work that existed

in significant numbers in the national economy R. at 22. The ALJ considered Mr. Jensen's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational guidelines, 20 CFR Part 404, Subpart P, Appendix 2. The ALJ agreed with the medical examiner that, from December 31, 2006 through April 30, 2008, Mr. Jensen was unable to perform any substantial gainful work activity because of his bowel issues. R. at 22. The ALJ concluded that Mr. Jensen is approaching the advance age (20 CFR. 404. 1563 an 416. 965). The vocational expert credibly testified that Mr. Jensen could no longer perform past relevant work. R. at 28. However, beginning on May 1 2008, Mr. Jensen had the residual functional capacity to perform a significant number of jobs in the national economy. R. at 28. Given the additional limitations that Mr. Jensen faced, the VE determined that there were jobs represented in the greater Chicago metropolitan area such as cashier, (15,000 jobs) Dictionary of Occupational (DOT) code 211.462.010, self service sales attendant (3,000 jobs), DOT Code 299.667-010, and usher (2,000 jobs), DOT Code 344.667.014.

The ALJ concluded that Mr. Jensen was disabled through April 30, 2008, but that, beginning May 1, 2008, he was capable of making a successful adjustment to work that existed in significant numbers in the national economy. R. at 28.

24

Accordingly, she found Mr. Jensen "not disabled" within the
meaning of the rules and regulations after May 1, 2008. R. at 28.
Mr. Jensen appealed that decision, but the Appeals Council denied
review, making the ALJ's decision the final decision of the
Commissioner.  Mr. Jensen then commenced this action, seeking the
reversal of the Commissioner's final decision or, in the
alternative, remand for further proceedings.

### STANDARD OF REVIEW

A district court reviewing an ALJ's decision must affirm if
the decision is supported by substantial evidence and is free
from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart,* 290
F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than
a mere scintilla"; rather, it is "such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). The
ALJ must "build an accurate and logical bridge from the evidence
to her conclusion." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th
Cir. 2001). In reviewing an ALJ's decision for substantial
evidence, the Court may not "displace the ALJ's judgment by
reconsidering facts or evidence or making credibility
determinations." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir.
2007)(citing *Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir.
2003)). Should conflicting evidence permit reasonable minds to

differ, it is the responsibility of the ALJ—not the courts—to determine if the claimant is disabled. *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990).

While the ALJ need not address every piece of evidence in the record, she must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Sims v. Barnhart,* 309 F.2d 424, 429 (7th Cir.2002). Unless the ALJ fails to rationally articulate the grounds for her decision in a manner that permits meaningful review, the Court must affirm if there is substantial evidence supporting the ALJ's decision. *Id.*

### SOCIAL SECURITY REGULATIONS

An individual seeking DIB must prove a disability under the SSA's five step inquiry. 20 C.F.R. § 404.1520. First, the ALJ establishes whether the individual is employed; second, the ALJ determines if the individual has a severe impairment; third, the ALJ decides if the impairment meets or medically equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ ascertains the individual's RFC and whether he can perform his past relevant work; finally, the ALJ determines whether the individual is capable of performing work in the national economy.

**DISCUSSION**

Mr. Jensen argues that the ALJ's decision should be reversed for three reasons. First, he argues, the ALJ failed to set forth a supportable basis in the record for finding that his condition improved as of May 1, 2008. Second, he argues that the ALJ's credibility findings were based on factual and legal errors. Finally, he argues that the ALJ failed to analyze his claims of fatigue and need for frequent, extended bathroom breaks, contrary to SSR 96-8p.

1. <u>The ALJ's End Date Determination</u>

The ALJ found that Mr. Jensen was disabled from December 31, 2006 through April 30, 2008, and that, as of May 1, 2008, he had improved to the point where he was no longer disabled. Mr. Jensen argues that this finding was unsupported in the record; he argues that the ALJ failed to cite any medical evidence or more favorable symptoms, signs, or laboratory findings that existed after May 1, 2008 to justify her finding that he had improved. He argues that, contrary to the ALJ's findings, he was still disabled after May 1, 2008, that his impairments existed that day and after, just as they existed on April 30, 2008.

The ALJ determined that Mr. Jensen showed medical improvement by May 1, 2008; she arrived at that date by essentially accepting the ME's testimony that, although symptoms

27

like those Mr. Jensen was experiencing after his colon surgery
were common, they typically resolve within a year after the
surgery.  So she gave him the full year after the colon surgery
(which occurred in April 2007).  The difficulty with this
conclusion is that it essentially ignores the fact that Mr.
Jensen had another surgery after this date.  He had a second
surgery on his shoulder in October of 2008, which certainly
suggests that his doctors accepted his complaints of debilitating
pain; it seems unlikely that they would have gone in for a second
surgery if they didn't think something was really wrong.  And
they had before them the same scans and X-rays that the ME had
before him.  The ME, on whose testimony the ALJ heavily relied,
acknowledged that debilitating pain in the wake of a surgery is
not uncommon and can last 3 to 6 months.  Record at 139.  He
testified that a second shoulder surgery in October of 2008 could
constitute an objective medical basis for Mr. Jensen's subjective
complaints of pain in March of 2010 (at the time of the hearing).
The ALJ ignored this testimony.  In fact, she seems to have
ignored the impact of his second surgery altogether.

The Social Security regulations provide that, in determining
whether a disability continues or ends, the administration
considers whether the claimant has seen any "medical
improvement."  *See* 20 C.F.R. §404.1594(b); 20 C.F.R. §416.994(b).

28

In this context, the term "medical improvement" is defined to mean "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled."  20 C.F.R. §404.1594(b)(1); 20 C.F.R. §416.994(b)(1)(I).  A determination that there has been medical improvement in the context of deciding whether benefits should continue, once awarded, "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)."  *Id.*  Under this standard, the ALJ would have been hard pressed to justify her determination that medical improvement occurred as of May 1, 2008.  First, there is no evidence, other than the testimony of the ME that symptoms typically resolve within a year of surgery, to suggest that anything was different from April 2008 to May of 2008.  There is evidence suggesting that his shoulder pain was constant; certainly the fact that he had a second surgery after the medical improvement date suggests that his shoulder impairment continued beyond that date.  The Commissioner argues that the surgical repair of the tear in his shoulder constitutes medical improvement.  And, although that could certainly be the case, the record shows that, to the extent the impairment did improve with surgery, it nonetheless still existed throughout the following

29

months, through October 2008, when the second surgery was
performed. Without some explanation as to why the ALJ disbelieved
some evidence and accepted other evidence, the May 1 date seems
particularly arbitrary.

Moreover, although the ALJ accommodated Mr. Jensen's limited
range of motion in his right shoulder by limiting him in his RFC
to occasional overhead reaching on that side, she did not in any
way account for the effects of his pain. In fact, she seemed to
dismiss his complaints entirely because she determined that there
was no basis for such pain in the objective medical records.
This was improper. "A lack of medical testimony in the record
supporting a claimant's subjective complaints of pain may be
probative of a claimant's credibility"; but "an ALJ may not
discount a Claimant's credibility solely on the basis of
objective medical evidence." *Allen v. Astrue*, 869 F.Supp.2d 924,
941 (N.D. Ill. 2012)(citing *Indoranto v. Barnhart*, 374 F.3d 470,
474 (7th Cir. 2004)(holding it was error for the ALJ to reject a
claimant's testimony because there was no clinical support for
the alleged limitation)). The ALJ spent little time discussing
credibility, noting only that "[t]he claimant was not credible in
his hearing testimony that claimed that he performed many fewer
activities of daily living." Record at 27. She never really
addressed his complaints of shoulder-related pain, and she should

30

have.  This is not to say that there weren't valid reasons for discounting Mr. Jensen's complaints of disabling pain; there were – notably the inconsistencies in what he told his doctors and what he told the ALJ.  But the ALJ was required to articulate the reasons for discounting his credibility in greater detail than she did.  Most especially, she was required to consider the measures he claimed he took to relieve his pain (e.g., sitting down, lying down, moving around a lot) and how those might affect his ability to work.  These are not necessarily inconsistent with the evidence on which she focused, which established that he could do more in terms of household chores than he admitted at the hearing.  Accordingly, remand is appropriate.

    2.   <u>The ALJ's Credibility Determination</u>

    Mr. Jensen next argues that the ALJ's credibility determination was contrary to SSR 96-7p.  That ruling is intended

> to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision.

At the outset, the ruling emphasizes that "[n]o symptom or combination of symptoms can be the basis for a finding of

disability, no matter how genuine the individual's complaints may
appear to be, unless there are medical signs and laboratory
findings demonstrating the existence of a medically determinable
physical or mental impairment(s) that could reasonably be
expected to produce the symptoms." SSR 96-7p, ¶1. The ALJ does
not seem to have relied upon this language, though given her
discussion concerning the lack of any objective medical evidence,
perhaps she could have. Instead, she discussed (or at least
listed) the factors outlined in the ruling that are to be
considered when assessing the credibility of an individual's
statements about symptoms and their effects (e.g., the
individual's daily activities; the location, duration, frequency,
and intensity of the individual's pain or other symptoms; etc.).
And she determined that his "statements concerning the intensity,
persistence, and limiting effects of these symptoms are not
credible beginning on May 1, 2008, to the extent they are
inconsistent with the residual functional capacity assessment for
the reasons explained below." R. at 24. To support this
determination, the ALJ noted that Mr. Jensen's "own report [a
Functional Report taken over the phone by an SSA representative
on July 25, 2008] was inconsistent with his hearing testimony
during which he alleged he was much more restricted in his
activities of daily living than indicated in [that report]." R.

32

at 25 (referring to R. at 271-278).  She also cited the ME's
testimony, to which she gave "great weight."  R. at 25.  She
notes that his colon surgery went well and that his first
shoulder surgery did too; she notes that any residual pain from
the former would not keep him from working and that any residual
effects of the latter are accounted for in her RFC, which limited
him in terms of overhead reaching.  R. at 24, 27.  She emphasized
that Mr. Jensen "was not credible in his hearing testimony that
claimed that he performed many fewer activities of daily living."
R. at 27.

　　　"When faced with a claimant alleging subjective pain
symptoms, an ALJ must evaluate the credibility of a claimant's
testimony about his pain."  *Allen v. Astrue*, 869 F.Supp.2d 924,
940 (N.D. Ill. 2012)(citing SSR 96-7p).  "The ALJ must consider
testimony in light of the entire record and be 'sufficiently
specific' as to the reasons for [her] credibility determination."
*Id.* In reviewing the ALJ's credibility determination, the Court
adopts a deferential approach. "Since the ALJ is in the best
position to observe a witness . . . his credibility finding will
not be overturned as long as it has some support in the record."
*Allen*, 924 F.Supp.2d at 940 (citing *Dixon v. Massanari,* 270 F.3d
1171, 1178-79 (7th Cir. 2001)).  An ALJ's credibility

33

determination will be reversed only if "patently wrong." *Allen*, 924 F.Supp.2d at 941.

Here, based upon the contradictions and inconsistencies between what Mr. Jensen reported to the SSA and to his doctors and what he testified to at the hearing before the ALJ, the Court cannot say that the ALJ's credibility findings were "patently wrong." But, as explained above, especially with regard to his shoulder pain, the ALJ was required to explain in greater detail the basis for discounting his claims of pain – particularly during the time period from May 1, 2008, when she found his disability ended, to October 2008, when he had that second shoulder surgery.

3.  <u>The ALJ's Consideration of Mr. Jensen's Complaints of Fatigue and a Need for Frequent, Extended Bathroom Breaks</u>

Mr. Jensen argues that the ALJ failed to properly analyze his need for quick access to a bathroom and his frequent extended bathroom breaks. Mr. Jensen argues that the ALJ disregarded September 2008 notes showing that he continued to have loose stools, averaging about three a day, along with abdominal pain, nausea, and headaches. R. at 489.

The ALJ acknowledged that, although Mr. Jensen's need to have access to a bathroom was credible, the evidence showed that his loose stools and pain had become less severe after May 1,

2008. His stools were not as frequent and urgent as they had
been previously, and when asked about his pain, Mr. Jensen
reported that his pain was not significant. The ALJ found that,
based on the objective medical evidence, Mr. Jensen's bowel
issues had improved. The ALJ also noted that Mr. Jensen denied
any abdominal, bowel or bladder problems in his February 2008
examination. R at 31.

The Commissioner argues that the ALJ appropriately relied on
the opinion of Dr. Miller, a gastrointestinal surgeon, that the
symptoms claimed by Mr. Jensen had no objective basis in the
medical records. The ME testified that, although symptoms such
as those claimed by Mr. Jensen were common after a hemicolectomy,
such symptoms gradually dissipate over time and are generally
resolved within one year; although the ME never expressly
testified that such symptoms never exist after a year, that was
certainly the import of his testimony. The ME noted that such
symptoms could be caused by peritonitis, or by a bowel
obstruction, or a loop in the bowel; but, he testified, nothing
in the record suggested that any of these conditions existed
(indeed, he testified, that, although the record did not include
all of the tests he might have expected to see, the only evidence
in the record on the issue suggested that none of these
conditions were present).

The Court finds that, contrary to Mr. Jensen's arguments, the ALJ did not fail to assess his claimed need to have quick access to the bathroom; rather, she disbelieved his testimony on the issue. Instead, she relied upon the evidence showing that these issues were no longer as urgent or as frequent as they had been before April 30, 2008. On more than one occasion Mr. Jensen denied having *any* bowel issues, and, in both March and February of 2008, Mr. Jensen reported that his bowel movements had improved. Accordingly, the Court will not second guess the ALJ's findings on this issue.

The same is true with regard to Mr. Jensen's claims of fatigue. The ALJ *did* consider his claims; she simply chose not to accept them. She noted that the record "does not support the claimant's allegations as to the serious issues resulting from these alleged impairments [anemia and fatigue]," R. at 27, and that is true; there is very little evidence in the record that even mentions fatigue. Because the ALJ articulated her reasons for dismissing Mr. Jensen's claims of fatigue, and because those reasons are supported in the record, the Court will not second guess them.

Relatedly, Mr. Jensen challenges the ALJ's RFC assessment, arguing that the ALJ failed to comply with Social Security Ruling 96-8p. SSR 96-8p explains how an ALJ assesses a claimant's

residual functional capacity; the RFC is "the most a claimant can still do despite his limitations." *E.g.*, *Bartucci v. Astrue*, No. 12 CV 2617, 2012 WL 6216747, at *6 (N.D. Ill. Dec. 13, 2012)(citing *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011)).  "Although the 'RFC assessment is a function-by-function assessment,' the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Bartucci*, at *6 (quoting *Knox v. Astrue*, 327 F. App'x 652, 657 (7th Cir. 2009); SSR 96-8p).

The ALJ determined that, beginning May 1, 2008, Mr. Jensen had the RFC to perform light work, except that he could never climb ladders, ropes or scaffolds and could only occasionally reach above shoulder level with his right arm. R. at 23.  In making this determination, and relying on SSR 96-7p, the ALJ determined that Mr. Jensen's colon cancer, shoulder injury and high blood pressure could reasonably be expected to produce the alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible beginning on May 1, 2008.  R. at 24.  For the reasons already explained, the Court finds that, with regard to Mr. Jensen's complaints of shoulder pain, the ALJ's analysis simply falls short.  The ALJ gave a detailed narrative of how Mr.

Jensen's impairments did and did not affect his ability to work. But she completely disregarded his complaints of shoulder pain and the effects his pain would have on his ability to work.

"The ALJ is not required to address every piece of evidence or testimony presented, but she must provide a 'logical bridge' between the evidence and his conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)(quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Here, the Court is unable to determine how the ALJ concluded that Mr. Jensen could perform the full range of light work, even with the restriction on overhead reaching, when his pain was so disabling that his doctors performed a second surgery on his shoulder just to find out why. Additionally, given his testimony about his shoulder pain and the affect it had on his ability to concentrate, the ALJ was at least required to explain why she was rejecting that testimony.

## CONCLUSION

In this case, the ALJ determined that Mr. Jensen was disabled from December 31, 2006 through April 30, 2008, but that he had improved to the point where he was no longer disabled after that date. For the reasons set forth above, the Court finds that the ALJ's finding concerning medical improvement as of May 1, 2008 is not supported by substantial evidence, and that the ALJ failed to build an accurate and logical bridge from the

38

record evidence to her conclusion concerning non-disability as of that date.  Accordingly, the Court grants Mr. Jensen's motion for summary judgment [#22] and denies the Commissioner's motion for summary judgment [#26].  The case is remanded to the Commissioner for further proceedings consistent with this opinion.

Dated: December 20, 2012

ENTER:

ARLANDER KEYS
United States Magistrate Judge